Wanamaker, J.
The sole question in this case is whether or not perjured testimony given under oath before a grand jury is privileged, that is, protected by public policy; or whether it may be the basis of a civil action in malicious prosecution.
The court of common pleas held it was not privileged.
The court of appeals held that it was privileged.
The case is here as one of public or great general interest.
The authorities cited by the court of appeals and by counsel for defendant in error in his brief in this case may fairly be said to sustain the judgment of the court of appeals. The weight of precedent for a century and more, in both American and English ruling cases, is undoubtedly to this effect.
This question has not heretofore been squarely or directly decided by the supreme court of Ohio, and we therefore approach it in the light of fundamental facts and primary principles, rather than upon mere precedent.
*244 Our Ohio fathers, in their first constitution, that of 1802, through their Bill of Rights (Section 18, Article VIII), announced much wholesome doctrine in these few words:
“That a frequent recurrence to the fundamental principles of civil government, is absolutely necessary to preserve the blessings of liberty.”
In the Constitution of 1851, still in force, there is found this pertinent language (Bill of Rights, Section 16) : “All courts shall be open and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law.”
Before we ever had an English Magna Charta, or an American Bill of Rights in the form of a constitution, federal or state, one of the most sacred rights of the citizen was the right to a good name and reputation and to be protected in the enjoyment of that good name and reputation.
Our constitutional fathers must have so regarded it or they would not have specially designated it in the organic law of our state.
Solomon has aptly spoken: “A good name is rather to be chosen than great riches and loving favor rather than silver and gold.” Shakespeare fittingly joined Solomon in his appreciation when he said:
“Good name in man and woman, dear my lord,
Is the immediate jewel of their souls:
Who steals my purse steals trash; ’t is something, nothing;
*245 ’T was mine, ’t is his, and has been slave to thousands;
But he that filches from me my good name
Robs me of that which not enriches him
And makes me poor indeed.”
The great ambition of the great Lincoln, in his own words, was to be “truly esteemed of my fellow men by rendering myself worthy of their esteem.”
This primary and precious right solemnly proclaimed in Holy Writ, in the lives and literature of our own people, in our constitutions and bills of rights, is too sacred a thing to be denied or destroyed by a mere “Thus saith the court.”
Precedents are valuable for information, admonition, and as milestones in the nation’s progress. ¡But they do not necessarily imply the last word of wisdom. They are not always to be adopted. They are quite frequently to be avoided. They are worth exactly what they weigh in right and reason when applied to the particular circumstances of each particular case. They must always have due regard to the natural equities of each special case.
It was an easy step from the dogma, the king can do no wrong, to the corollary, the king’s councillor, the king’s chancellor, the court can do no wrong. The courts are fallible, though some of us seem fearful of admitting it. The judicial records show that we have reversed not only other courts, but have reversed even ourselves, and *246 wisely, too; and so it will ever be. The old doctrine that the regular orderly processes of the court cannot be inquired into, though tainted with fraud and perjury, where personal rights are lost or damages sustained, finds little favor in these modern times when justice is the goal of all good government, judicial no less than legislative or administrative.
It is to say the least a singular sort of logic that holds that any ordinary citizen, in any ordinary conversation, by the use of false and malicious slander, wrongs another citizen, for which the latter has a right of action in damages, but that when the wrongdoer, in order to give additional credibility and sanction to his wrong, uses a court of justice as the vehicle for his perjury in the assassination of character, a public policy should intervene to protect him in his wrongdoing and save him from redressing the grievous injury he has committed against his fellow citizen.
What do courts mean when they say that a public policy demands the absolute privilege of such testimony ?
A correct definition, at once concise and comprehensive, of the words “public policy” has not yet been formulated by our courts. Indeed, the term is as difficult to define with accuracy as the words “fraud,” “equity,” “welfare.”
In substance, it may be generally said to be the community common sense and common conscience extended and applied throughout the state to matters of public morals, public health, public safety, public welfare, and the like. It is that general *247 and well-settled public opinion relating to man’s plain, palpable duty to his fellow man, that has due regard to all circumstances of each particular situation.
Our written public policies are put into our constitutions, our statutes, and ordinances, but our unwritten public policies rest largely in judicial judgment and public opinion.
Manifestly, when the constitution of the state declares and defines certain public policies, such public policies must be paramount, though a score of statutes conflict and a multitude of judicial decisions be to the contrary.
No general assembly is above the plain, potential provisions of the constitution, and no court, however sacred or powerful, has the right to declare any public policy that clearly contravenes or nullifies the rights declared in the constitution.
What public policy is invaded when the plaintiff Kintz, in a court of competent jurisdiction, pleads and proves the false and malicious testimony given by Harriger before the grand jury?
Can it be that courts and grand juries have any duty to protect known perjurers? Surely cases are abundant in the record which show that the public has prosecuted witnesses for perjury, not only in the trial court but before the grand jury. Surely as against the public there is no such immunity. Why should there be any immunity as against the private citizen who has been especially wronged, who has been “filched” of his good name ?
What is the particular policy under whose mask *248 it is sought to invoke the absolute privilege of protection to the perjured witness in this case? It is undoubtedly regard for the ancient doctrine of giving absolute immunity and protection to judicial proceedings in due course of law. But surely such a doctrine can by no possible jugglery be applied to a court of justice or to any of its proceedings — a court, which is charged first, last and all the time with administering justice, based upon the truth — when it has before it an obvious and palpable case of the grossest injustice, based upon the grossest untruth.
The doctrine as announced from leading cases appears at 25 Cyc., 376, in these words:
“The doctrine of absolute privilege is founded on the principle that in certain cases it is advantageous for the public interest that persons should not be in any way fettered in their statements and is confined to cases where the public service or the due administration of justice requires that a person shall speak his mind freely.”
No quarrel can be had with this doctrine when fairly interpreted and applied. If it be manifestly “advantageous for the public interests that persons should not be in any way fettered in their statements,” and if “the due administration of justice requires that a person shall speak his mind freely,” then it must be conceded that the public right should be paramount to any private right. But surely the word “fettered” here is not to be used in the broad sense that perjured testimony may be offered. Surely the oath that the witness *249 takes before the grand jury, in and of itself, fetters him to the truth. It is only when he violates the obligation of that oath that he commits the wrong.
Moreover, “that a person shall speak his mind freely” accords with the doctrine of freedom of speech and freedom of press; but that same constitutional right is qualified by the fact that he shall be responsible for its abuse.
The celebrated case of Vogel, Exr., v. Gruaz, 110 U. S., 311, uses this language in announcing the policy: “The avenue to the grand jury should always be free and unobstructed.”
This is probably the shortest and strongest plea in the shape of public policy made for the immunity of perjury before the grand jury. This doctrine is subject to the same criticism announced above.
You might as well have no oath “truly to testify” if you apply the doctrine of absolute privilege, as contended for in the court below.
Having had some six years’ experience as prosecuting attorney, and some seven years as a judge of the court of common pleas, I think I may say with some assurance that the avenues of a grand jury should never be free and unobstructed to per-jurors— to those who want to wreak their vengeance or employ their hate in the star chamber proceedings of the grand jury.
I can conceive of no good reason why the grand jury should be “free and unobstructed” to the lawless. the conscienceless, and the utterly irrespon *250 sible citizen who seeks to work reprisals upon his fellows.
A public policy like a tree must be judged by its fruits. Contemplate for a moment the consequences of such a public policy when it became generally known to the [public. When acted upon generally by the public, think of the number of reputations, built up by many years of patient and honorable reverence for law and order, and by successful achievement, that could be destroyed over night l;y those who could thus assassinate character with impunity. But not alone would the wrongs fall as an insufferable burden upon the individual; contemplate the large number of wrongful, unwarranted and unconscionable prosecutions that would be conducted in the name of the state, at great labor, time and expense, which must finally result in the acquittal of those indicted and put upon trial by such false and malicious testimony.
The egregious evil that would result to society, to the public and to every private citizen from announcing and sustaining such a doctrine of absolute privilege of immunity to perjurers before grand juries is so manifest that no further argument would seem necessary.
The whole duty of courts is to ascertain the facts, the truth in any given controversy, and then apply the fundamental principles of justice to that truth, and when by any species of jugglery it is claimed that the courts should announce a public policy that works out the greatest injustice, bottomed upon the grossest untruth, — well, it is just such hairsplitting distinctions as these that have *251 too frequently undermined, and justly undermined, public confidence in our courts.
If this prosecution had been started before a magistrate, upon an affidavit falsely, wilfully and maliciously made, including the identical matters testified to before the grand jury, the rule is well settled in Ohio, though it is with regret that I say many states hold to the contrary, that such perjured affidavit can be made the basis of an action in malicious prosecution.
Why then should there be any different rule applied, when, instead of doing it publicly before the magistrate, by affidavit, the wrongdoer does it in the secret chambers of the grand jury room and thereby obtains the sanction of an official action by having the charge found and presented by the grand jury as an official arm of the court.
It surely is a distinction without any difference, except that before the justice of the peace the charge was that of the prosecuting witness alone, whereas by indictment the prosecuting witness wrongfully caused it to be made the official charge of a grand jury in the court of common pleas.
True, one qualification has been placed by those courts holding for complete immunity, to-wit, as long as such evidence is relevant to the matter concerning which it is given. If irrelevant, therefore, these same courts have held that it may be used as the basis of a suit in damages for malicious prosecution, though given under the cover of a grand jury.
How are these two positions distinguishable? Obviously upon the basis that in one the evidence is *252 relevant, and in the other irrelevant. But both do damage, that which is relevant more frequently than that which is irrelevant.
Yet how can such a distinction apply to an obvious and admitted falsehood? A falsehood is relevant to nothing. It fits no truth. It does not even fit another falsehood. After all, it is but the “tangled web.”
Oaths are too lightly regarded nowadays, not only before the grand jury but in trial courts; aye, in every place where they are required for some qualification.
It is high time indeed for the public to know what the oath implies, the obligation which it carries, and that one may not maliciously assassinate the good name of another under the mask of an oath before a grand jury and then have a court of justice intervene to protect him from such a rank wrong.
While this court has never before had before it the precise question in this case, some landmarks have been made touching the civil action known as malicious prosecution. Some of these cases have been invoked to sustain the judgment below.
Let us examine several of them briefly.
In this behalf the case of Lanning v. Christy, 30 Ohio St., 115, has been invoked. This was not an action, however, in malicious prosecution. It was an action for libel, put in the form of a written plea. Yet fundamentally it does deal with some of the basic principles involved here, because it relates to defamatory matter touching one’s good name and reputation.
*253 The syllabus of that case reads as follows:
“An action will not lie for statements contained in an answer alleged to be libelous, if such statements were honestly made, without malice, and if they were relevant, believed by defendant to be true, and were made upon probable cause, and under advice of counsel.”
This syllabus might tend to sustain the soundness of the judgment below were it not for the fact that the Lanning v. Christy case differs from the case at bar in the following respects:
1. “Honestly made.”
2. “Without malice.”
3. “Believed by defendant to be true.”
4. “Made upon probable cause.”
5. “Under advice of counsel.”
Not a single one of these distinguishing elements appears in the present case.
The other Ohio case relied upon is the case of Liles v. Gaster, 42 Ohio St., 631. It is sufficient to quote a part of the first paragraph of the syllabus in that case, which recites this fact: “For aught that is stated in the petition, these answers were relative to the issue then on trial, and were honestly believed to be true, though in fact they were untrue.”
Courts have gone a long way in protecting the bona fides of the individual. But where the facts are not only not convincing but concededly to the contrary, it is inexcusable, especially upon the part of a court, to extend its powers for the protection of such infamy.
*254 The judgment of the court of appeals is therefore reversed and the judgment of the court of common pleas affirmed.

Judgment reversed.

Nichols, C. J., Matthias, Johnson and Donahue, JJ., concur.
Robinson, J., not participating.